Cynthia George **MILES**, Appellant,

v.

William Charles **MILES**, Appellee.

**File No. S–3448.**

Supreme Court of Alaska.

Aug. 2, 1991.

---

Sema E. Lederman, Law Offices of Hansen & Lederman, Anchorage, for appellant.

Jeffrey M. Feldman, Gilmore & Feldman, Anchorage, for appellee.

Before RABINOWITZ, C.J., and MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This appeal arises from the superior court's division of marital property in the divorce proceeding of Cynthia George Miles and William Charles Miles. Cynthia contends that the superior court abused its discretion by holding that William's lobbying practice, Miles & Associates, had no goodwill value or that any such goodwill would be unmarketable. Cynthia also asserts that the superior court's equal division of marital property was in error. Next, Cynthia argues that the superior court erred in finding three Alaska properties (an Anchorage duplex and four-plex and Caswell Lakes property) to be William's separate property. She additionally claims that the court erred in finding the down payment on the couple's Florida condominium to be William's separate property. Finally, at oral argument, Cynthia questioned the court's valuation of the marital estate. She contends that capital gains taxes had been paid out of the marital estate subsequent to the sale of William's separate property; therefore, the capital gains payment should have been factored into the valuation of the marital estate.

We affirm the superior court's property division and its decision to divide the marital property equally.

## I. THE MARKETABLE GOODWILL OF MILES & ASSOCIATES

■ In assessing the value of goodwill, the court must determine the existence of goodwill and whether such goodwill could actually be sold to a prospective buyer. *Moffitt v. Moffitt,* 749 P.2d 343, 347 (Alaska 1988). If no goodwill exists, or if it is unmarketable, then there should be no value considered when dividing the marital assets. *Id.*

■ In this case, the trial court used an accepted method of business valuation, capitalization of excess earnings, to determine whether goodwill exists. *Hunt v. Hunt,* 698 P.2d 1168, 1170 n. 1 (Alaska 1985). Based on the testimony of William's expert witness, Ronald Griesen, the superior court found that Miles & Associates possessed no goodwill value. Because Greisen was qualified as an expert in business valuation, we find no error in the court's acceptance of his testimony.[1] We therefore affirm the superior court's finding that the lobbying practice possessed no goodwill value. As there was no goodwill, we do not reach the issue of whether goodwill would have been marketable had it existed.

## II. THE EQUAL DIVISION OF THE MARITAL PROPERTY

■ In *Merrill v. Merrill,* 368 P.2d 546, 547 n. 4 (Alaska 1962), we listed factors to be considered in dividing marital property: earning ability of the parties, their station in life, the circumstances and necessities of each, their physical conditions and health, their financial circumstances including the time and manner of acquisition of the property at issue, its value at the time and any income producing capacity. The equitable allocation of marital assets is left to the broad discretion of the trial court and will not be disturbed on appeal absent a showing of abuse of discretion. *Hurn v. Hurn,* 541 P.2d 360 (Alaska 1975).

■ The superior court found both parties to be well-educated professionals capable of earning substantial incomes. It

therefore equally divided the marital property. Cynthia has failed to show that this decision was clearly unjust. In the absence of findings to warrant an unequal division, we have held that an equal division of the marital estate is presumptively the most equitable. *Hayes v. Hayes,* 756 P.2d 298, 300 (Alaska 1988). We affirm the decision of the superior court with respect to the equal division of the marital estate.

## III. THE ALASKA PROPERTIES WERE WILLIAM'S SEPARATE PROPERTY

■ Before dividing marital assets, the trial court must determine what property is available for equitable distribution; the supreme court reviews this decision under an abuse of discretion standard. *Wanberg v. Wanberg,* 664 P.2d 568, 570 (Alaska 1983). However, when examining the superior court's decision, the supreme court may question whether the trial court applied the correct legal standard when it exercised its discretion. *Id.*

*Anchorage Duplex and Anchorage Four-plex*

■ Although the duplex and four-plex were William's property prior to the marriage, Cynthia contends that the parties treated these properties as joint holdings during the marriage and that her active interest in maintenance and management showed an intent to jointly hold them. However, the facts in this case do not establish intent to hold these properties jointly. Cynthia did not contribute to mortgage payments or reside on the properties, *cf. Burgess v. Burgess,* 710 P.2d 417, 420 (Alaska 1985), nor did she assume any financial risk or work extensively to maintain or manage them. *Cf. Wanberg,* 664 P.2d at 571–73.

The superior court found that Cynthia's efforts were *de minimis* and did not constitute an active interest in either the duplex or the four-plex, and her efforts did not contribute to the active appreciation of the properties. However, the trial court

---

**1.** The court relied on Greisen's method for selecting a proper comparison group of lobbyists in order to determine whether William's lobbying practice had goodwill value.

compensated Cynthia for her minimal contributions when it held that $36,000 of the proceeds from the sale of the four-plex was marital property. We find that the trial court did not abuse its discretion by treating the Anchorage properties as William's separate property.

### Caswell Lakes Property

The superior court found that the payments on the Caswell Lakes property made during the marriage were *de minimis*. As neither party was able to produce documentation of the actual payments on the property, there is no reason to conclude that the superior court's finding was clearly erroneous. *See Moffitt*, 749 P.2d at 348. A party who fails to present sufficient evidence at trial should not be allowed to challenge the inadequacy of evidence on appeal. *Hartland v. Hartland*, 777 P.2d 636, 640 (Alaska 1989). We therefore affirm the finding of the superior court that the Caswell Lakes property was William's separate property.

### IV. THE DOWN PAYMENT ON THE FLORIDA CONDOMINIUM WAS WILLIAM'S SEPARATE PROPERTY

William made a $19,773 down payment on the Florida condominium with funds from his separate account containing the sale proceeds from the Anchorage four-plex. The superior court treated the condominium as a joint holding[2] but determined that the down payment remained William's separate property and not part of the marital equity in the condominium.

In previous cases, we have held that where a property distribution comes within the parameters of AS 25.24.-160(a)(4),[3] the distribution "will not be disturbed unless it is clearly unjust." *Wanberg*, 664 P.2d at 570 (citations omitted). It is within the trial court's discretion to find that premarital assets have become part of the marital estate.[4] However, we have held that the act of comingling assets "does not automatically establish intent to jointly hold property, and a court always should consider the property's source when determining what assets are available for distribution." *Carlson v. Carlson*, 722 P.2d 222, 224 (Alaska 1986). Thus, the trial court retains discretion to decide whether a premarital asset remains separate property even where the asset has been treated as joint property. The trial court makes this determination in the context of an equitable division of marital assets and its balancing of the parties' situation under the *Merrill* factors. *Merrill*, 368 P.2d at 547 n. 4.

The trial court found that William had made the down payment on the Florida condominium from premarital assets and subsequently made all mortgage payments from his separate funds.[5] We find that the court properly applied its discretion when it determined that the down payment remained a premarital asset and excluded it from the marital equity in the condominium.

---

2. The record shows that the parties established an intent to hold the Florida property jointly. Cynthia and William held title to the condominium and both were obligors on the note. During the marriage, they visited the condominium several times each year, and both worked to repair and improve it.

3. AS 25.24.160(a)(4) gives the court discretion to invade premarital assets and sets out the factors to be used in making such decisions.

4. In *Wanberg*, this court found that the wife's participation in financing, constructing, and maintaining a five-plex manifested an intention to treat the property as a joint holding even though the land itself had been the husband's separate property prior to the marriage. 664 P.2d at 571–72. In subsequent cases, we have upheld the invasion of premarital assets when the parties demonstrated an intent to treat the assets as joint property by virtue of both spouses taking an active interest in its ongoing maintenance, management and control. *E.g., Burgess*, 710 P.2d at 420; *Moffitt*, 749 P.2d at 346–47.

5. The Miles' situation can be distinguished from *Matson v. Lewis*, 755 P.2d 1126 (Alaska 1988), where we upheld a finding that a down payment made from separate property had become a marital asset. In *Matson* the parties made monthly payments from marital assets and had evidenced an intent to convert the premarital asset into marital property. *Id.* at 1128.

## V. CAPITAL GAINS TAXES

■ Cynthia argues that the marital estate paid capital gains taxes on William's separate property[6] and that this circumstance should have been considered by the superior court in making its determination of the value of the marital estate.[7] William counters that the marital estate also paid capital gains taxes on Cynthia's separate property and further contends that his separate property provided tax benefits to the marital estate.[8] As these issues were not argued at trial nor briefed on appeal, we will not consider them.[9] *Wetzler v. Wetzler*, 570 P.2d 741, 742 n. 2 (Alaska 1977).

AFFIRMED.

BURKE, J., not participating.

RABINOWITZ, Chief Justice, dissenting in part.

I disagree with the court's determination in Part IV that the down payment on the Florida condominium was William's separate property.

The key issue is whether the parties intended the $19,773 to become joint marital property or to remain separate property. *Matson v. Lewis*, 755 P.2d 1126, 1127 & n. 2 (Alaska 1988); *Moffitt v. Moffitt*, 749 P.2d 343, 346–47 (Alaska 1988); *Burgess v. Burgess*, 710 P.2d 417, 420 (Alaska 1985); *Wanberg v. Wanberg*, 664 P.2d 568, 571–72 (Alaska 1983).

It is true that parties may, by their actions during marriage, demonstrate intent to treat specific property as joint holdings even though they were acquired by one spouse prior to marriage. *Wanberg*, 664 P.2d at 571. *Where such intent is established, usually through joint management and control of the property, a court will consider the property to be a marital asset. Id.* However, the act of commingling, in itself, does not automatically establish intent to jointly hold property, and a court always should consider the property's source when determining what assets are available for distribution.

*Carlson v. Carlson*, 722 P.2d 222, 224 (Alaska 1986) (emphasis added).[1]

Here, the record indicates that the parties intended the $19,773 to be part of the marital estate. As the court acknowledges, the superior court treated the condominium as a joint holding, based on more than a commingling of assets: "The record shows that the parties established an intent to hold the property jointly. Cynthia and William held title to the condominium and both were obligors on the note. During the marriage, they visited the condominium several times each year and both worked to repair and improve it." *Supra*, at 132 n. 2.

In contrast to the court, I find *Matson* indistinguishable. In both cases, the property was taken jointly. The only distinguishing feature is that in *Matson*, the monthly payments were clearly made from marital assets. This distinction is not controlling; here, there simply is no explicit

---

**6.** Cynthia states that the joint tax returns show $32,635 in capital gains taxes paid on the sale of William's separate property.

**7.** This issue was raised in Cynthia's proposal for distribution of property and during oral argument before this court.

**8.** The couple's 1982 tax return shows $8,472 paid on the sale of Cynthia's separate property. No figure is given for tax benefits from William's separate property.

**9.** The capital gains issue presents a question of first impression for this court. Had the issue been properly raised, this court would have remanded it for recalculation of the value of the marital estate considering (1) whether capital gains taxes were paid out of marital assets on Cynthia's and William's separate properties, and (2) to what extent depreciation and other tax benefits from the separate properties added value to the marital estate.

**1.** In *Carlson*, we found a four-plex purchased during the marriage to be marital property, although the down payment came from the husband's separate property. The parties lived in one unit and the wife helped manage the rental units. Also, a lot purchased before the marriage was considered marital property because the wife had power of attorney to sign the purchase papers and title was taken jointly. An improved lot in Michigan was considered separate property, on the other hand, because the husband bought it and improved it before the marriage. There was no intent to jointly hold that property.

evidence as to the source of the monthly payments.[2] More importantly, in *Matson* the lots were unimproved; there was no indication that the parties worked together to improve them. Yet here, both William and Cynthia made repairs and improvements to the condominium. On this record, I would hold that the superior court abused its discretion in "backing-down" the $19,-773 down payment and in failing to classify this amount as marital property.[3]

2. The majority opinion states, "The trial court found that William had made the down payment on the Florida condominium from premarital assets and subsequently made all mortgage payments from his separate funds." *Supra,* at 132. (Footnote omitted.) However, on the question of the subsequent mortgage payments, the superior court actually stated that "Bill paid all of the holding costs associated with the Florida condominium from the date of separation through the end of September 1988, at which time he then begin [sic] to occupy the condominium." It was Bill's Statement of the Evidence that indicated that he made payments on that property every month. Yet, even his Statement of the Evidence does not say when those payments began or from which account those payments were drawn. Cynthia, in fact, contends they both made payments. As to the downpayment itself, Cynthia testified that she always considered that they had bought the Florida condominium together; she never knew what source was used for the down payment.

3. William claims that a reclassification will not make a difference because the superior court deducted the $19,773 when it awarded William his separate portion of the bank account from which this money was drawn. He believes that under Cynthia's formula, the superior court would have to deduct the down payment from the marital portion of that account, leaving each party with the same net proceeds. However, William overlooks the explicit finding by the superior court that the down payment for the condominium came out of his separate portion of the "four plex account." Given the superior court's ruling that the down payment came from William's separate funds, a correct distribution would have made a difference. The court should have divided the total equity in the condominium equally while still deducting the down payment from William's separate property.