Sheila Beth SPARKS n/k/a Sheila Beth Vaden, Appellant and Cross–Appellee,

v.

Richard Alan SPARKS, Appellee and Cross–Appellant.

Nos. S–12935, S–12955.

Supreme Court of Alaska.

June 25, 2010.

Robert C. Erwin, Palmier ˉErwin, LLC, Anchorage, for Appellant and Cross–Appellee.

Paul J. Nangle, Paul J. Nangle & Associates, Anchorage, for Appellee and Cross–Appellant.

Before: FABE, Chief Justice, CARPENETI, and WINFREE, Justices.

*OPINION*

CARPENETI, Justice.

# I. INTRODUCTION

In this dispute about property division following a divorce, the wife appeals the trial court's classification of settlement proceeds as marital property. The husband appeals the trial court's classification of retirement health benefit as the wife's separate property and the trial court's division of property, claiming that he should have been awarded a greater share due to health problems he suffered. The husband also appeals findings regarding valuation of various items of marital property and classifications of various other debts and assets as marital or separate. Because the evidence supported a finding of intent to donate the disputed portion of the settlement proceeds to the marital unit, we affirm the trial court's classification of the settlement proceeds. We also affirm all of the trial court's other rulings regarding the classification and valuation of the marital property, with three exceptions: We remand for further fact finding and clarification regarding (1) whether agreement was reached on the value of the parties' personal property, (2) the date on which certain credit card debt was accrued, and (3) the calculation of the value of necessary repairs to one of the homes.

# II. FACTS AND PROCEEDINGS

Richard Sparks and Sheila Vaden were married on August 15, 1989 in Wasilla, Alaska and separated on June 6, 2006. Richard was fifty and Sheila was fifty-two at the time the decree of divorce was issued in November 2007.

Sheila was employed by the state, and her interest in her Public Employee Retirement System benefits vested in June 1986. She medically retired in 1996 because of complications from diabetes. In 2001 AETNA, her disability insurance carrier, discontinued her disability payments. Sheila sued AETNA, settling in 2004. Section 2.1(A) of that settlement ("2.1(A) annuity") provided for a monthly payment of $4,362 "for the lives of Sheila Sparks and Richard Sparks" and provided for reduced payments to Richard if Sheila predeceased him. Section 2.1(B) provided for semi-annual payments to Sheila, and 2.1(C) for additional monthly payments. The agreement designated the 2.1(A) and (B) payments as "damages on account of personal physical injuries or physical sickness" and 2.1(C) as replacement of disability benefits.

Richard's employment history was more complicated. He did not work in 2005, 2006 and 2007, and reported no earnings to social security from 1998–2004. In 1994–95 he worked for the Department of Corrections. During the early 2000s he also ran a drywalling business and worked on Sheila's mother's property at Solo Creek, intending to eventually open a tourist business and lodge there. Richard testified that he had health problems including a head injury and knee injury. He indicated that this would prevent him from being rehired as a corrections officer and that he could not physically work, but had not sought a disability determination.

Richard and Sheila's contested marital property included two homes, one on Caskill Road and one on Phalarope Road, and eight lots at Birch Hill and personal property at all three locations. They also disputed a cabin and one acre plot at Solo Creek owned by Sheila's mother. Miscellaneous debt and property will be further set out in each relevant section discussing Richard's claims on cross-appeal.

Following trial on division of the marital property in September 2007, the superior court rendered its oral decision on the record in October and issued written findings of fact and conclusions of law in November. The parties each filed motions for reconsideration but Sheila filed this appeal before the court had an opportunity to respond to the motions

for reconsideration. After supplemental briefing regarding the superior court's jurisdiction to address the pending motions, the court in March 2008 issued a recalculated spreadsheet regarding the value of the Caskill residence and the crediting of negative equity on the family vehicles. Richard requested clarification of certain entries on the recalculated spreadsheet, and the court issued a clarification in April 2008.

Sheila appeals the court's treatment of the personal injury settlement with her disability benefit insurer. Richard cross-appeals the court's decision on numerous issues of characterization, valuation, and division of property.

## III. STANDARD OF REVIEW

 The division of marital property requires that property first be characterized as marital or separate, then that the property be valued, and finally that it be distributed equitably.[1] The determination of whether property is marital or separate is a mixed question of law and fact.[2] Characterization of proceeds of a settlement is in large part a legal determination that we review de novo, but we disturb findings of fact made in determining whether to include the settlement proceeds in the marital estate only if they are clearly erroneous.[3]

 Property valuations are factual findings which we overturn only if clearly erroneous.[4] We review the trial court's conclusions regarding the distribution of property for abuse of discretion.[5]

## IV. DISCUSSION

### A. With One Exception, The Trial Court Did Not Err In Classifying The Parties' Property As Marital Or Separate.

#### 1. The AETNA settlement annuity

 The designation of damages in a tort settlement does not control whether the proceeds are marital or separate.[6] Under our decision in *Bandow v. Bandow*,[7] the trial court must carry out an analysis of what the damages were intended to replace.[8] Compensation that replaces post-divorce future earnings is separate, while compensation for economic loss to the marital unit is marital.[9] Furthermore, compensation for pre-divorce non-economic damages, such as pain and suffering, is generally separate property.[10]

 In certain circumstances, separate property may be transmuted to marital property if the owner intends to convey the property to the marital unit and the owner's conduct demonstrates that intent.[11] We have held that placing separate settlement proceeds into joint title raised a presumption that the party intended to donate separate property to the marital unit.[12]

Here, there were three types of periodic payments set out in Section 2.1 of Sheila's settlement agreement, in addition to a lump sum payment that covered the loss of income to the marital estate before the settlement: 2.1(A)—Monthly payments of $4,362 (increasing annually by two percent) continuing for the lives of Sheila Sparks and Richard Sparks; 2.1(B)—semi-annual payments of $19,500 payable to Sheila for four years; and

1. *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006).

2. *Id.*

3. *Hatten v. Hatten*, 917 P.2d 667, 672 n. 11 (Alaska 1996).

4. *Brandal v. Shangin*, 36 P.3d 1188, 1191 (Alaska 2001).

5. *Id.* at 1192.

6. *Hatten*, 917 P.2d at 672.

7. 794 P.2d 1346 (Alaska 1990).

8. *Id.* at 1348.

9. *Id.*

10. *Id.* at 1349.

11. *Sampson v. Sampson*, 14 P.3d 272, 276 (Alaska 2000).

12. *Abood v. Abood*, 119 P.3d 980, 984 (Alaska 2005) (holding that presumption overcome where wife introduced evidence that intent in placing proceeds in joint account was for administrative convenience rather than to make donation to marriage).

2.1(C)—monthly payments of $1,934.95, payable to Sheila for 191 months. The superior court held that the payments provided for in 2.1(A) and 2.1(C) were marital and accordingly awarded them to both parties (Section 2.1(A) payments were awarded equally to the parties, while 2.1(C) payments were divided by coverture fraction). Finding that the 2.1(B) payments were separate property, and that the parties stipulated that they should be held for the parties' son, the court awarded them all to Sheila.

Sheila argues that the payments in 2.1(A) and (B) are designated as "damages on account of personal physical injuries or sickness," while the payment in 2.1(C) was intended to replace future lost income. She asks us to conclude that Sections 2.1(A) and 2.1(B) were intended to replace personal injury damages and therefore, under *Bandow v. Bandow*,[13] must be separate property. Because the court awarded Section 2.1(B) to Sheila as her separate property, she appeals only the designation of the annuity in 2.1(A), the payments which were designated to be paid "for the lives of Sheila Sparks and Richard Sparks."

The third provision of the settlement periodic payments, in Section 2.1(C), was intended to replace disability benefit payments from the time of the settlement forward. The trial court awarded Sheila this income in full until she reached retirement age. Because she would receive these benefits in lieu of retirement benefits, the court treated these benefits like retirement benefits earned during the marriage, which are divided using a coverture fraction based on the length of the marriage. This is the correct treatment under *Conner v. Conner*,[14] which held that income replacement such as workers' compensation and long-term disability replaces retirement benefits after the payee reaches retirement age.[15] Therefore, it was proper to treat the post-retirement portion as imputed retirement payments and apply the coverture fraction to that payment. Sheila argues that *Conner* is inapplicable to 2.1(A) and (B), and we agree. However, she appears to concede that under *Conner*, the payments in Section 2.1(C) "could be a partial replacement for long-term disability benefits and thus marital property." In fact, the agreement is explicit and clear that the Section 2.1(C) payments replace long-term disability benefits. We therefore agree with the trial court that the retirement portion is a marital asset under *Conner*.

The Section 2.1(A) annuity was designated as a personal injury payment. However, there were factual disputes regarding Sheila's intent to convey the settlement to the marital unit. Given that she may have had such an intent, the issue arose whether the personal injury money had been transmuted into marital property.[16] The inquiry into whether the property was transmuted required the court to weigh factual evidence of conduct showing an intent to make a donation to the marital unit.[17] We have held in the past that where an inheriting spouse has represented that the proceeds of an inheritance would be "shared" by the parties, this evidence "is not sufficient to overcome the strong presumption that an inheritance is separate property."[18] Similarly, we have concluded that an inheriting spouse's "belief and representation that the inherited assets would be available for [both parties] during the marriage do not suffice to warrant a finding that the assets were converted to marital property."[19] A spouse's statement

---

**13.** 794 P.2d 1346, 1349 (Alaska 1990) (holding that tort damages are separate property except where intended to replace pre-divorce lost earnings).

**14.** 68 P.3d 1232 (Alaska 2003).

**15.** *Id.* at 1235.

**16.** *See Hansen v. Hansen*, 119 P.3d 1005, 1013 (Alaska 2005) (holding that separate property may become marital property if spouse donates it to marital unit with intent at time of donation that property become marital).

**17.** *See id.; see also Abood*, 119 P.3d at 984–85 (placing property into joint title raises presumption of donative intent, although presumption may be overcome if evidence of different intent at time of placement into joint title is produced).

**18.** *Lundquist v. Lundquist*, 923 P.2d 42 (Alaska 1996).

**19.** *Sampson v. Sampson*, 14 P.3d 272, 275 (Alaska 2000).

that separate property will be available to both spouses "must be understood as referring to the period during which the parties remained married."[20] In *Sampson*, we concluded that "[b]ecause the inheriting [husband] made no promises to [his wife] upon which she relied," a finding that the husband intended to transmute his inheritance into marital property was clearly erroneous.[21]

The key issue in transmutation cases involving a claim that the separate property has been transmuted based on a theory of implied interspousal gift is the "presence of donative intent."[22] In evaluating and determining the intent of the alleged donor, "[t]he best proof of intent to transmute is ... an express statement by the owning spouse that he intended to give the other spouse an interest in the property."[23] The persuasiveness of a spouse's express promise to make a gift of separate property to the other spouse depends on the context and circumstances of the promise,[24] and "[w]here the statement was made with some degree of formality, it is likely to carry significant weight...."[25]

Here, there was formal documentation of Sheila's decision to transmute the separate property, and she communicated that decision to Richard through both words and conduct. Richard is designated explicitly as a payee in Exhibit A, Addendum 1 to the settlement for Section 2.1(A) payments, showing an intent to treat these payments differently from the other portions of the settlement. The payments are to continue "for the lives of Sheila Sparks and Richard Sparks" and for a minimum of 20 years. Although the settlement empowers Sheila to designate a beneficiary for the 2.1(A) payments in the event that both she and Richard died, it prohibits her from selling, encumbering, or assigning the 2.1(A) payments during her lifetime. Richard testified at trial that Sheila

was counseled that naming Richard as a payee for the duration of his life would make it "not ... just her money anymore." He also testified that he and Sheila decided together to structure that portion of the annuity as "our long term retirement," and deliberately made it payable to both of them contrary to her attorney's advice.

Sheila argues that she understood her attorney to be telling her not to put the annuity in his name, but that she assumed it would be fine to put the payments in both names and that she could later change the payees. She testified that "the annuity is solely my ownership." But the settlement does not support that assertion, nor does it give her the power to remove Richard as payee before his death. Multiple inferences are possible regarding her intent at the time she signed the settlement entitling both parties to payment of the 2.1(A) annuity. The conflicts between Richard's testimony and Sheila's testimony, and between Sheila's testimony and the settlement and addendum, required the trial court to weigh the evidence of intent based on the credibility of the two parties to decide Sheila's intent at the time the settlement was drafted.[26] It was not clear error based on the evidence before the court to find that Sheila promised Richard he would be entitled to part of the 2.1(A) annuity.

### 2. Sheila's retiree health insurance benefits

The trial court concluded that Sheila's lifetime health insurance benefits vested before the marriage and were therefore premarital property. Richard challenges this conclusion, arguing that Sheila continued to contribute to her retirement benefits with marital funds during the marriage and pointing to Sheila's monthly premium statements for support. However, the monthly premium statements provide no evidence that any portion of the monthly premium is being applied

---

**20.** *Id.*

**21.** *Id.* at 277.

**22.** 1 BRETT R. TURNER, EQUITABLE DIVISION OF PROPERTY § 5:69, at 664 (3d ed.2005).

**23.** *Id.* at 665.

**24.** *Id.* at 667.

**25.** *Id.*

**26.** *See Evans v. Evans*, 869 P.2d 478, 481 (Alaska 1994) (holding that it is trial court's function to evaluate witness credibility and weigh conflicting evidence).

to anything other than that month's insurance coverage. Sheila responds that the correct interpretation of the monthly statement is that each employee payment of a monthly premium constitutes only a contribution to that month's coverage, not to the long term subsidy that the employer provides.

Sheila's interpretation is better supported by the evidence in the record. Her expert testified that Richard could not have acquired an entitlement to post-retirement benefits unless he was married to Sheila on the date of her retirement under the state's benefit scheme. The expert also considered the premium payments made during the marriage and testified that no payment contributed to the value of Sheila's post-retirement benefit. Finally, the expert also testified that once an employee vests in the retiree health insurance program, the state of Alaska pays the subsidy amount for the beneficiary's health insurance from age of retirement forward. The expert testified that nothing was added to the value of that subsidy during Sheila's work during the marriage.

Under our rule in *Hansen v. Hansen*,[27] post-marriage health insurance benefits acquired with marital funds are marital property.[28] The trial court distinguished *Hansen* on the ground that the evidence showed that none of Sheila's work during the marriage increased or contributed to the value of the health insurance benefits.

Richard presents an alternative argument: that the entire retirement health insurance benefit should be seen as transmuted because he was listed as a health insurance beneficiary. But transmutation does not apply to retirement benefits, which are usually designated as partly marital and partly separate based on which portion was earned during the marriage.[29] Here, the evidence did not establish that any of the value of her post-retirement benefits was earned during the marriage. Because the factual finding that all of the value of Sheila's post-retirement health benefits were earned before

marriage is supported by the record and not clearly erroneous, we affirm the trial court's conclusion that the health benefits are separate property.

### 3. Insurance payment for damage to privacy fence at Caskill home

■ A privacy fence at the Caskill property was damaged by wind six months after the parties' date of separation. The Caskill property was a marital asset and the value of the property was awarded to Richard. The insurance payment for the damage was paid to Richard. Richard deposited the payment in a joint account, and then transferred it to his separate account. The trial court awarded half of that amount to Sheila.

Richard argues that the date of separation is relevant to when he incurred the expense of the fence repair, and analogizes the situation to case law holding that debt taken on after separation to acquire an asset makes the asset separate.[30] Richard argues that because he will have to bear the cost of repairing the fence, while Sheila will have no obligation to do so, he should have gotten the entire value of the reimbursement. We disagree.

Richard is not in debt to anyone or under any obligation to replace the privacy fence. The fence was marital property when destroyed, and both parties suffered the loss of the value of the fence. Moreover, the trial court did not include the fence in the calculation of the value of the home; the court valued the home using Sheila's appraiser's valuation and Richard's list of repairs necessary to bring the home up to code, which did not include the privacy fence. The privacy fence was apparently not taken into account in the appraisal of the Caskill property, because it is not mentioned in the report. The valuation of the Caskill property occurred on June 28, 2007, more than a year after separation and therefore apparently long after the wind damage occurred. And Richard had

---

**27.** 119 P.3d 1005 (Alaska 2005).

**28.** *Id.* at 1015 (holding that health benefits earned during marriage are marital asset of insured spouse).

**29.** *Zito v. Zito,* 969 P.2d 1144, 1147 (Alaska 1998).

**30.** *See Hunt v. Hunt,* 698 P.2d 1168, 1171–72 (Alaska 1985).

not repaired the fence as of the trial on September 7, 2007, so clearly it was not repaired before the appraisal. Because both parties owned the fence when it was destroyed, and both shared any resulting loss in the home's value, it was not error for the trial court to classify it as part of the marital estate.

#### 4. Refund for marital carpet purchase

During the marriage Richard paid $2,500 for carpets; he used the marital credit card for this purchase. Then he transferred the debt onto a card in his own name but apparently with the same account number. When he received a refund for the carpet after the separation, it was credited to the card that was now in his name only. The trial court ruled that the refund was a marital asset. Richard argues that he retired a marital debt with a marital asset and should not have owed Sheila any of the refund. We disagree. Richard incurred a marital debt, the burden of which Sheila shared and which was part of the balance of the account that was divided as marital debt. But the refund was not applied to that debt; rather, it reduced Richard's sole debt on his separate credit card account many months after the date of separation. It was proper for the court to classify the refund as a marital asset.

#### 5. Discover card

The trial court did not address the Discover card in Richard's name during its decision on the record or in its findings of fact. In Richard's motion for reconsideration, he claimed the balance of that card was a marital debt. Sheila argued that the balance on this card consisted entirely of post-separation debt and therefore should not have been included in the marital estate. The trial court stated in denying reconsideration that it had not included this debt in the marital estate because it was post-separation debt. However, the official date of the parties' separation in the findings of fact was June 6, 2006, and the statement for the card reflects purchases from May 2006 and includes a substantial previous balance. For that reason, we remand for clarification and further written findings regarding the pre-separation balance on this card.

#### B. The Trial Court Did Not Clearly Err In Its Valuation Of The Solo Creek Improvements Or The Birch Hill Lots.

Richard argues that the trial court erred in valuing his improvements to the Solo Creek property and in valuing the Birch Hill lots. He notes that the court rejected his estimates of value even though a property owner's estimate of value is competent evidence, and he argues that Sheila's expert never set foot on the property, failed to consider comparable sales, and developed a "ludicrous" estimate. Sheila responds that the weight accorded to each source of evidence is squarely within the province of the trier of fact.

The trial court weighed Sheila's expert's appraisal testimony and Richard's own valuation of the work that he contributed to the property in valuing the improvements Richard made to the Solo Creek property. Likewise, the court weighed Sheila's expert's appraisal of the Birch Hill lots against tax appraisals of these lots. Richard does not now contest the qualification of the appraiser as an expert, nor did he object at trial to the appraiser being qualified. He did not submit competing expert testimony. He did submit tax valuations of the value of the lots, which he argues are strong evidence of their actual value. However, we have held that tax assessments ordinarily are not good evidence of value.[31] As Sheila argues, this leaves the trier of fact to weigh competing evidence, and we will not overturn the court's findings in these circumstances absent clear error.[32] Because the trial court's valuations were not clearly erroneous, we affirm them.

#### C. The Trial Court Did Not Abuse Its Discretion In Distributing Assets.

##### 1. Richard's health concerns

Richard argues that the trial court did not correctly apply the statutory factors

---

31. *Harrower v. Harrower*, 71 P.3d 854, 862 (Alaska 2003) (holding that tax appraisals do not reliably measure true value).

32. *See Haisley v. Grant*, 486 P.2d 367, 370 (Alaska 1971).

in AS 25.24.160[33] because it did not account for his health or the availability and cost of health insurance for him. The trial court found that Richard injured his knee, fell from a horse and injured his back, had twice been kicked in the head by horses, and had major dental problems associated with being kicked by the horses. Richard did not present medical records at trial. Richard argues that a fifty-year-old male with his health problems cannot obtain affordable health insurance and that the court should be directed to account for his conditions and the cost of health insurance.

The trial court assumed in its oral decision on the record that Richard could obtain his own health benefits from the state at retirement: "The court would note a spouse is entitled to health benefits through the state retirement system [if] there is a [QDRO]." Under AS 39.35.535(d), a former spouse who is awarded a portion of a state employee's Public Employee Retirement System (PERS) benefit under a qualified domestic relations order (QDRO) is entitled to purchase state major medical coverage. Richard was awarded a coverture portion of Sheila's PERS account in the decision on the record, and hence would be entitled under section .535(d) to obtain health insurance.

Even if this were not the case, we see no abuse of discretion here. In *Martin v. Martin*,[34] we held that the trial court did not abuse its discretion when it refused to award PERS benefits—which would have allowed the husband to obtain coverage under AS 39.35.535(d)—because the husband failed to show that he had no other means of obtaining his own health insurance.[35] We noted that we would only find an abuse of discretion in this situation if the superior court's

decision produced a clearly unjust result.[36] Sheila argues that the result here is not unjust because (1) Richard presented inadequate evidence that he could not work, and (2) Richard had never sought disability benefits through Social Security that would be an alternate source of health insurance. The superior court also found that the size of the estate was such that Richard would be able to obtain health insurance with his portion of the estate. Even if he were unable to obtain state coverage, we would not find this to rise to the level of injustice that would warrant a finding of abuse of discretion.

### 2. Sheila's Caskill property taxation payments

■ Sheila was given a credit for half the amount she paid after the separation date on the property taxes for the Caskill property. Richard argues that Sheila made the post-separation payment of taxes on the Caskill home with marital funds, and that as a result it was error to give her a credit for them. The payments were made from the joint account containing the AETNA settlement part 2.1(A) annuity payments later designated as marital property; Richard and Sheila were each awarded half these payments. Therefore he claims that the payments were "an exercise in using marital property to preserve marital property."

In *Ramsey v. Ramsey*,[37] we noted that no fixed rule need be imposed for crediting a spouse who has used post-separation, non-marital income to maintain marital property.[38] We held that a court has broad discretion to determine how and whether to credit such payments, including the discretion to credit the spouse with all or none of such payments.[39] Here, the situation is different

---

**33.** AS 25.24.160(a) provides in relevant part:
In a judgment in an action for divorce ... (4) the division of property must fairly allocate the economic effect of divorce by being based on consideration of the following factors: ... (B) the age and health of the parties; (C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market ...; [and] (D) the financial condition of the parties, including the availability and cost of health insurance....

**34.** 52 P.3d 724 (Alaska 2002).

**35.** *Id.* at 731.

**36.** *Id.*

**37.** 834 P.2d 807 (Alaska 1992).

**38.** *Id.* at 809.

**39.** *Id.*

from *Ramsey* in that payments were made from the 2.1(A) settlement annuity, the entirety of which the trial court classified as marital and then divided evenly between Sheila and Richard. However, as Sheila points out, she was only credited with half of the tax payments. We conclude that the trial court acted within his discretion in crediting Sheila with half of the post-separation tax payments that she made with an account that was half her property.

### D. It Was Error To Accept The List Of Personal Property Provided By Sheila As The Stipulated Division And Valuation.

 On the last day of trial, the parties told the court that they would meet to divide the personal property by stipulation. In October 2007 when the parties met for an oral decision on the record, Sheila's counsel presented the court with "Attachment A–Y," which she said was the stipulated division that the parties had earlier agreed to in court. The court appeared to agree with Sheila that the amounts had been agreed to in court. Richard's counsel contested this, said that no stipulation had been reached, and said he would obtain a transcript showing that he in fact had only agreed to work later with Sheila on a written stipulation. He also told the court that he would file a motion for reconsideration with the transcript so that the division of the rest of the property could be ruled on that day. During this exchange, Richard's counsel did not state that his client agreed with Attachment A–Y.

Sheila asserts that Richard's attorney agreed to the settlement in open court, and that Richard did not object, but Sheila provides no evidence of this assertion beyond citing to the discussion above, which does not support that assertion. When Richard filed his motion for reconsideration with the transcript of the relevant exchange in open court, the transcript included the court's statement that the parties would meet to further work out personal property division: "[A]ll the parties are going to get together and see what they can do with the [property division]. . . ." Given that this was the only discussion of the matter, and that Richard clear-

ly objected at the October 2007 hearing to the claim that he had entered into a stipulation, it was error to base judgment on Attachment A–Y.

Richard also points out an unexplained variance between the expert's appraisal of the value of Sheila's personal property and the amount the court credited her with having received. The appraisal report itself appears to be the source of the error. The report consists of columns, one for Sheila and one for Richard, with the value of each item allocated according to the property division. At the bottom of each page, there is a total handwritten at the bottom of the columns. When they are added together, the total is $28,450. However, the typewritten total for all the property at the end of the valuation is $12,391. Sheila offers no explanation of the difference.

We therefore remand for fact-finding regarding whether the parties ever reached an agreement regarding the personal property, and, if not, for further proceedings as necessary to reach an equitable division of the parties' personal property.

### E. The Trial Court's Post–Trial Reconsideration And Recalculation Of The Spreadsheet Requires Clarification.

 Richard argues that the court made an unexplained error in recalculating the assets awarded to the parties after Richard's motion for reconsideration. Specifically, he alleges that the trial court changed the figures used to calculate the value of the Caskill home without explaining the change. In its oral findings on the record, the court credited Richard's testimony that it would be necessary to make $54,977 in repairs to bring the house up to code, which would increase the house's value to $215,000. The court calculated the value in its spreadsheet by subtracting $54,977 from $215,000. Richard requested reconsideration on the grounds that the outstanding mortgage debt of $24,949 should also have been subtracted, leading to a value for the home of $135,074. The court recalculated the value to account for the mortgage, but changed the amount necessary to make repairs to $30,027 instead

of the $54,977 it originally· found necessary. In the court's explanation of its calculations, it is not clear if this change was intentional. The court stated: "The court evaluated the evidence, including the photographs of the residence and found Mr. Sparks's evidence that repairs totaling $30,027.63 were necessary to make the appraisal value accurate were credible by a preponderance of the evidence." While a reevaluation of the value of the repairs and the use of an adjusted amount would not necessarily have been an abuse of discretion, we are unable to determine if the new figure was based on a reevaluation or a transcription error based on the language of the order.[40] We remand this issue for clarification.

## V. CONCLUSION

We AFFIRM the judgment below in all but three aspects, which we REMAND to the trial court for further proceedings to determine: (1) whether agreement was reached on valuing the parties' personal property and, if not, the correct valuation and division of the property; (2) the classification of the debt on the Discover account (related to the date on which it was incurred); and (3) the value of the repairs necessary to bring the Caskill home up to code.

MATTHEWS and EASTAUGH, Justices, not participating.

---

40. Because the difference between the original amount that the court attributed to necessary repairs ($54,977) and the later amount that the court attributed to repairs ($30,027) is $24,950, and because this amount is almost exactly the amount of the outstanding mortgage that Richard said on reconsideration should have been subtracted from the value of the house, ($24,949), we are unsure whether the new figure is accurate.