*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CHARLES WIEGERS, | ) | |
| | ) | Supreme Court No. S-16406 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-14-01739 CI |
| v. | ) | |
| | ) | O P I N I O N |
| AMY RICHARDS-WIEGERS, | ) | |
| | ) | No. 7244 – May 11, 2018 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Bethany Harbison, Judge.

Appearances: Mary-Ellen Meddleton, Anchorage, for Appellant. Daniel L. Callahan, Callahan Law Office, Fairbanks, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Carney, Justice, not participating.]

WINFREE, Justice.

## I.     INTRODUCTION

A couple divorced after nearly 30 years of marriage. The former husband appeals the superior court's valuation of his corporate stock and its characterization of the former wife's retirement health benefits as non-marital property. We affirm the court's stock valuation, but we reverse its characterization of the retirement health benefits as non-marital. We therefore remand for valuation of the health benefits and reconsideration of the equitable distribution of the marital estate.

## II.  FACTS AND PROCEEDINGS

### A.  Facts

Amy Richards-Wiegers and Charles Wiegers married in 1987; they separated in 2014, and their divorce was finalized in 2016.  Two assets important to the equitable division of their marital estate are the focus of this appeal.

### 1.  Charles's A & A Roofing Company, Inc. stock

In the early 1990s Charles became an officer and shareholder of A & A Roofing Company, Inc., a closely held corporation selling and installing commercial and residential roofing.  At separation Charles was the president of A & A Roofing and owned 7,652 shares, about 47% of the company's outstanding stock.

A & A Roofing's shareholders have a Shareholders' Agreement restricting the transferability of and setting the price for its stock.  The price may be modified at any time by a vote of shareholders holding 75% of the voting shares "to reflect any amount they agree to be the then current fair market value of the [s]tock."  No particular valuation method is identified, but in 1983 the company adopted a valuation calculation referred to as "Method 2," a liquidation calculation first used in the 1970s by its then-existing sole shareholder for estate planning purposes.  Although Method 2 is not dictated by the Shareholders' Agreement, it has been used for about 35 years to value A & A Roofing's stock.

Since 2010 Method 2 has been used to value A & A Roofing's stock four times:  $211/share effective January 1, 2010; $220/share effective December 31, 2010, in anticipation of a shareholder's retirement; $184/share effective January 1, 2013, following a distribution of cash and assets to facilitate the prior shareholder's retirement; and, most recently, $179/share effective January 1, 2015, just before Charles's divorce trial.  On June 11, 2015, the three then-existing shareholders signed an "Unanimous Written Consent in Lie[u] of Special Meeting by Shareholders" "determin[ing] the 'Fair

Market Value' of A & A Roofing Co., Inc. as of January 1, 2015 [to be] $179/share."
The $179/share value was recorded in the corporate minutes on December 9, 2015, about the time the divorce trial started.

### 2. Amy's retirement health benefits

Amy began working for the University of Alaska in 1979, with a brief break in service in 1980. Her position was covered by the Alaska Public Employees' Retirement System (PERS). Amy's PERS Tier 1 retirement health benefits vested in 1985 after five years of employment, before the marriage. Amy continued working for the University until January 1999, 18.7 total years of PERS service, accruing 11.7 years during the marriage. Amy was eligible to retire and access her retirement health benefits in July 2016 at age 55, and indicated at trial she would do so.

### B. Proceedings

The divorce trial took place over four days between December 2015 and May 2016. A & A Roofing's certified public accountant testified to the company's use of Method 2 for stock valuation and other aspects of A & A Roofing's business. Amy called a certified public accountant, who is also a business valuation expert, to testify about business valuation methods other than Method 2. Neither provided an independent valuation of A & A Roofing stock.

The superior court issued a March 2016 order that Amy's PERS retirement health benefits were a premarital asset as a matter of law because they were fully vested prior to the marriage. In June the court determined, among other things, that Charles's A & A Roofing stock value was $217/share under the "true asset approach as described in [Amy's expert's] testimony." The court's division of the marital estate incorporated these determinations.

Charles appeals.

## III.   STANDARD OF REVIEW

"There are three basic steps in the equitable division of marital assets: (1) deciding what specific property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably."[1]   The first step, characterizing property as marital or non-marital, involves mixed questions of law and fact; "we review the superior court's legal conclusions de novo and its factual findings for clear error."[2] The second step, factual determination of property value, is also reviewed for clear error.[3]   "Clear error exists when we are 'left with a definite and firm conviction that the superior court has made a mistake.' "[4]   The third step, equitable property distribution, is reviewed for abuse of discretion[5] and "we will not disturb the result unless it is clearly unjust."[6]

## IV.   DISCUSSION

Charles briefed two issues on appeal:  whether the superior court erred by (1) finding the value of Charles's A & A Roofing stock to be $217/share, and (2) determining Amy's PERS retirement health benefits were non-marital.

---

[1]     *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015) (quoting *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013)).

[2]     *Id.* (citing *Beals*, 303 P.3d at 458-59).

[3]     *Beals*, 303 P.3d at 459.

[4]     *Ethelbah v. Walker*, 225 P.3d 1082, 1086 (Alaska 2009) (quoting *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 220 (Alaska 2007)).

[5]     *Id.*

[6]     *Cartee v. Cartee*, 239 P.3d 707, 712 (Alaska 2010) (citing *Walker v. Walker*, 151 P.3d 444, 447 (Alaska 2007)).

**A.** **The Superior Court Did Not Clearly Err By Valuing Charles's A & A Roofing Stock At $217/Share.**

Charles argues the superior court's valuation of his corporate stock is clearly erroneous because the court relied upon unsupported expert testimony to reach it. Charles contends the correct fair market value, as determined by the company's Method 2 valuation formula, is $179/share. Amy supports the court's valuation, arguing that Method 2 is not an appropriate calculation of fair market value and that her business valuation expert testified in support of the court's valuation.

**1.** **The superior court's reliance on Amy's expert's "true asset" valuation is supported by the record.**

The superior court found that "the most reliable way to value the A & A stock for purposes of effecting an equitable division of the marital estate would be to use a true asset approach as described in [Amy's expert's] testimony. [On that basis], the court value[d] the A & A business at $217 per share."

Qualified expert witness testimony provides an adequate basis for a court's business valuation finding.[7] Amy's expert, the only qualified business valuation expert to testify, explained that business valuators are "mandated to comply" with one of three "main" accepted methodologies when valuing a company: income approach, asset approach, or market approach. Method 2 is indisputably a liquidation approach, not an accepted methodology, and Amy's expert concluded it was not an accepted valuation methodology regardless of its historic use by A & A Roofing. The record supports the superior court's determination that Method 2 was not "the most reliable way to value the A & A stock for purposes of effecting an equitable division of the marital estate."

---

[7] *See Miles v. Miles*, 816 P.2d 129, 131 (Alaska 1991) (holding "no error" in accepting expert's testimony providing method for determining whether business had goodwill value because expert "was qualified as an expert in business valuation").

Amy's expert testified that the asset approach provides a baseline valuation. The expert explained that A & A Roofing's Method 2 valuations state the assets and liabilities necessary for an asset approach, but unnecessarily and improperly include sale costs and tax deductions. In response to the superior court's inquiry of how to "convert" Method 2 to a "true" asset approach, the expert explained the tax and sale costs deductions in the Method 2 worksheet should be removed, thus preserving only the valuation of assets and liabilities.

Charles argues it was error to rely on Amy's expert's conversion of A & A Roofing's Method 2 worksheets to a "true" asset method "because he was not hired to provide a business valuation and had not gathered any data." But Charles disputes neither that the asset approach is a valid valuation method nor that the expert explained how an asset approach (what the court called a "true asset approach") involves calculating "the value of [a company's] net assets."[8]

Because Amy's expert provided an adequate basis for using the asset approach to value A & A Roofing and because it is a recognized valuation method,[9] the record supports the superior court's determination that "the most reliable way to value the A & A stock for purposes of effecting an equitable division of the marital estate would be to use a true asset approach as described in [Amy's expert's] testimony."

### 2. The superior court's "true asset" valuation of A & A Roofing stock at $217/share is not clearly erroneous.

Charles argues the superior court did not have sufficient expert testimony before it to value A & A Roofing using an asset approach because Amy's expert did not

---

[8] *See Manelick v. Manelick*, 59 P.3d 259, 261, 265 (Alaska 2002) (accepting expert's definition of net assets as total assets minus total liabilities and holding business's fair market value was value of its net assets).

[9] *See id.* at 261, 265.

independently calculate or verify the company's assets and liabilities. Amy's expert testified that his application of the asset approach was premised on the validity of the data A & A Roofing provided in its Method 2 valuation. He explained that an asset approach relies on all the accounts receivable, accounts payable, and contingent liabilities being accounted for. When the court inquired whether the net value of the assets from the most recent Method 2 worksheet would provide an accurate or "true" asset valuation, the expert qualified his affirmation with the assumption that all the payables and crude liabilities were accounted for in the worksheet.

Amy's expert did not provide his own valuation, explaining it would have taken 60 to 70 hours to confirm that "all the receivables are recorded and payables recorded to get a fair market value." Instead, he reviewed A & A Roofing's Method 2 valuation worksheets, income statements, and balance sheets from 2010 through 2015, created by and testified to by A & A Roofing's accountant. A & A Roofing's accountant also testified that he or his partner performed yearly independent reviews of A & A Roofing's financial statements for many years.

Amy's expert's testimony was premised primarily on A & A Roofing's 2015 year-end Method 2 valuation worksheet, which he reorganized to make his testimony more understandable. His main critique of the Method 2 analysis was its deduction of sale costs and taxes, a liquidation approach that depressed the company's value. Amy's expert's reorganized worksheet separated out the assets, liabilities and equity, sale costs, and taxes. He termed his net asset calculation A & A Roofing's "Fair Market Value Equity." The difference between this "Fair Market Value Equity" and A & A Roofing's Method 2 "Agreed Value," the respective fair market valuation figures for A & A Roofing, are Method 2's deduction of sale costs and taxes. In response to the superior court's questioning, Amy's expert confirmed the court could arrive at a "true" asset" valuation by taking the "fair market value equity, . . . not reduce it by selling

expenses or taxes, [and] divide [that number] by the outstanding shares." As Amy argues, "[u]nder [her expert's] guidance, the court simply declined to deduct speculative costs of sale and taxes from the asset value determined by A & A [Roofing] itself."

Charles did not object to Amy's expert's characterization of A & A Roofing's finances in his reorganized worksheet or his testimony arriving at the "true asset" result. Charles also chose not to cross-examine Amy's expert after his discussion about application of the "true asset" method with the court. Charles does not argue in his briefing that the reorganized worksheet is inaccurate. Charles instead argues that the superior court lacked sufficient expert testimony to render an asset valuation because Amy's expert relied on data provided by A & A Roofing's accountant. But Charles does not argue in his briefing that the underlying data is incorrect.

We have found clear error where "no reliable evidence in the record supports the court's [business] valuation" because the parties' valuations were based on speculative assumptions.[10] Amy's expert admitted that his reorganized worksheet was premised on A & A Roofing's Method 2 valuation and that his review of A & A Roofing was limited to the Method 2 valuations and company financial and income statements. But his characterization and application of the asset method to the Method 2-based streamlined worksheet did not erroneously rely on speculative assumptions because A & A Roofing's accountant testified that the company's financial statements are independently verified each year, lending credibility and reliability to the data underlying A & A Roofing's Method 2 worksheet and Amy's expert's streamlined version.

When the record is viewed as a whole, we are not left with a definite and firm conviction that the superior court made a mistake by valuing the stock at $217/share under the chosen valuation method.

---

[10]     *Krize v. Krize*, 145 P.3d 481, 488 (Alaska 2006).

### 3. Charles's other arguments are unavailing.

Charles argues that the shareholder agreement is a buy-sell agreement and that its implicit adoption of Method 2 is the best indicator of the A & A Roofing shares' fair market value. But we repeatedly have held that the superior court is not bound by a buy-sell agreement valuation.[11] Because the record supports the court's stock valuation at $217/share under the true asset method, the court did not err by applying a method other than Method 2 derived from the shareholder agreement to value the A & A Roofing shares.

Charles argues the superior court abused its discretion by removing the sale costs and taxes included in its application of the true asset method. But the court need not consider sale costs or taxes in a property division if a sale or taxable event is not inevitable.[12] The court allotted Charles all of his A & A Roofing shares, awarding Amy half of the value of those shares to be distributed by an equalization payment. Because Charles failed to present proof that the equalization payment to Amy will cause a forced sale of his shares or result in an "immediate and specific tax liability,"[13] the court did not abuse its discretion by excluding tax or sale costs from its true asset valuation.[14]

---

[11] *See Sloan v. Sloan*, 18 P.3d 60, 64 (Alaska 2001); *Money v. Money*, 852 Pl2d 1158, 1161 (Alaska 1993).

[12] *Fortson v. Fortson*, 131 P.3d 451, 461 (Alaska 2006).

[13] *See Dundas v. Dundas*, 362 P.3d 468, 477-78 (Alaska 2015) ("The party seeking to equitably allocate the tax consequences must present 'proof that a taxable event will occur in connection with the division of property.' " (quoting *Oberhansly v. Oberhansly*, 798 P.2d 883, 887 (Alaska 1990))).

[14] *See Fortson*, 131 P.3d at 461 ("Because the court did not require [the party] to sell the property, the tax effects were not specific and immediate, and the court did not abuse its discretion in denying [the party] a credit for possible tax effects and costs
(continued...)

Charles next argues the superior court erred by failing to apply a minority shareholder discount in valuing his stock, contending the marketability of his shares is limited because his 46.94% ownership of A & A Roofing stock is not a controlling interest. But Charles failed to provide a suggested minority shareholder discount at trial. Because the superior court was not required to apply a minority discount[15] and Charles failed to establish a need for or provide a suggested calculation of such a discount, the record supports the superior court's decision not to apply a minority discount.

Charles finally argues the superior court erred by failing to adjust its valuation to take into consideration "the stock sale restrictions of the Shareholders' Agreement." Charles explains that the Shareholders' Agreement restricts stock sales by requiring two years' notice of a shareholder's intent to retire to receive full value for a shareholder's stock. Thus, "at the time of trial, [Charles] could only sell his shares of stock for $179 per share, and then only if he were to retire or die."[16] This argument is unavailing; even if the shares could not be sold under any circumstances, they still represent significant value to Charles.[17] For example, about a year before the parties separated, Charles purchased 2,001 shares from a prior shareholder for $220/share. Because unmarketability does not preclude the court "from determining what price a

---

**14** (...continued)
resulting from a sale.").

**15** *See Hanson v. Hanson*, 125 P.3d 299, 308 (Alaska 2005) (holding court may consider minority discount, but does not have to apply discount in all instances).

**16** A & A Roofing will buy back a shareholder's shares for their full value, as set in the Shareholders' Agreement, only in the circumstances of retirement or death; a shareholder who quits or becomes disabled will receive only a percentage of the shares' value.

**17** *See Martin v. Martin*, 52 P.3d 724, 731 (Alaska 2002) ("[A]n asset need not be marketable if the court can objectively determine that it has value to its owner.").

buyer would pay," the superior court did not clearly err in its fair market valuation of Charles's A & A Roofing shares under the "true asset" method.[18]

**B.    Concluding As A Matter Of Law That Amy's PERS Retirement Health Benefits Were A Non-Marital Asset Was Error.**

Amy's PERS retirement benefits vested before she married Charles, and Amy continued working for the University for nearly 12 years during the marriage. Relying on *Sparks v. Sparks*,[19] the superior court ruled as a matter of law that Amy's PERS retirement health benefits were a premarital asset because vestment occurred prior to marriage. We review the superior court's legal conclusion de novo.[20]

Charles argues the superior court's ruling is "legally erroneous" because we overruled *Sparks* in *Engstrom v. Engstrom*.[21] Because we said in *Engstrom* that "the earning spouse continues to pay for even fully-vested retirement benefits while she continues to work,"[22] Charles contends the superior court should have characterized a portion of Amy's PERS retirement health benefits as a marital asset. Amy argues that because the *Engstrom* facts significantly differ from those in *Sparks* and at issue here, the court was correct in applying *Sparks* rather than *Engstrom*.

We calculate the marital portion of a benefit using the coverture fraction introduced in *Hansen v. Hansen*: the numerator is "the number of years worked during

---

[18]    *See id.*

[19]    233 P.3d 1091, 1096-97 (Alaska 2010).

[20]    *See Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015).

[21]    *See id.* at 771.

[22]    *Id.*

the period of coverture" and the denominator is "the total number of years worked."[23] "Only the marital portion of the retirement health insurance benefit is divisible" between spouses because "post-divorce, pre-retirement health insurance benefits are compensation for contemporaneously performed work and are therefore separate property, whereas post-retirement health insurance benefits are compensation for work previously performed."[24] The number of years the spouse in *Hansen* worked included years worked prior to marriage because the spouse had "used marital funds to buy back health benefits for work performed before the parties began living together."[25]

*Sparks* addressed the factually similar situation of a wife's PERS retirement benefits plan that had vested prior to marriage.[26] In that case an expert witness testified that premium payments made during the marriage contributed no value to the wife's post-retirement benefit, and the wife's work during the marriage added nothing to the subsidy the State paid at the age of retirement.[27] The superior court held the retirement health benefits were non-marital because "the evidence showed that none of [the wife]'s work during the marriage increased or contributed to the value of the . . . benefits."[28] We affirmed the superior court's conclusion that the benefits were separate property "[b]ecause the factual finding that all of the value of [the] post-retirement health benefits

---

[23]     119 P.3d 1005, 1015 (Alaska 2005) (citing BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 6.10 (2d ed. 1994)).

[24]     *Id.* (citing BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 6.26 (2d ed. Supp. 2004)).

[25]     *Id.*

[26]     *Sparks v. Sparks*, 233 P.3d 1091, 1096-97 (Alaska 2010).

[27]     *Id.* at 1097.

[28]     *Id.*

[was] earned before marriage is supported by the record and not clearly erroneous."[29] *Sparks* did not explicitly apply the coverture fraction; however the coverture fraction implicitly applied was years the benefit vested during marriage divided by total years for vestment.[30]

In *Engstrom* the employee benefit analysis shifted from earning the benefits to funding the benefits.[31] We stated "the earning spouse continues to pay for even fully-vested retirement benefits while she continues to work, both through her employer's contributions and through her acceptance of a lower salary than she might otherwise receive."[32] We overruled *Sparks* to the extent it was inconsistent with this holding.[33] In other words, under *Engstrom* the coverture fraction is the years during the marriage the earning spouse contributed to funding the retirement benefit divided by the total years worked; under *Sparks* the coverture fraction was years the benefit vested during marriage over total years for vestment.

This case fits squarely under *Engstrom*. Amy's PERS Tier 1 retirement health benefits vested in 1985. Amy and Charles were married in 1987. Amy continued working for the University and accrued 11.7 years of PERS service during the marriage. Under *Engstrom* Amy continued funding her fully vested retirement benefits during the marriage, and the benefits funded during those years must be characterized as marital.[34]

---

[29]     *Id.*

[30]     *Id.*

[31]     *Engstrom v. Engstrom*, 350 P.3d 766, 771 (Alaska 2015).

[32]     *Id.*

[33]     *Id.*

[34]     *See id.*

Because *Engstrom* controls, applying *Sparks* to determine as a matter of law that Amy's entire retirement benefit is non-marital was error. We reverse the decision characterizing Amy's retirement health benefits as non-marital and remand to value those benefits. Because this changes the composition of the marital estate, the superior court may also reconsider its equitable division.

## V.        CONCLUSION

We AFFIRM the valuation of Charles's A & A Roofing stock at $217/share. We REVERSE the characterization of Amy's retirement health benefits as entirely non-marital and REMAND for valuation of those benefits and for a renewed consideration of the equitable distribution of the marital estate.