*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, e-mail corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ANDREW ENGSTROM, | ) | |
| | ) | Supreme Court No. S-14752 |
| Appellant, | ) | |
| | ) | Superior Court No. 1JU-10-01052 CI |
| v. | ) | |
| | ) | O P I N I O N |
| BECKY JO ENGSTROM, | ) | |
| | ) | No. 7006 - May 15, 2015 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Philip M. Pallenberg, Judge.

Appearances: Kara A. Nyquist, Anchorage, for Appellant. Blaine H. Hollis, Juneau, for Appellee.

Before: Fabe, Chief Justice, Stowers, Maassen, and Bolger, Justices.

MAASSEN, Justice.
WINFREE, Justice, dissenting.

I.      INTRODUCTION

In this divorce case, the husband appeals from a superior court decision dividing the marital property. He raises two issues with regard to his wife's retirement health insurance benefits: he argues first that the superior court erred in determining the marital portion of those benefits, and second that the superior court erred in the rate it

selected for valuing those benefits. We hold that the superior court's resolution of these issues was consistent with our prior cases and therefore affirm it.

The husband also challenges the superior court's award to the wife of a larger share of the marital property, which the court justified on grounds that (1) the wife would have primary care of the couple's child, and (2) the husband was receiving two income-producing businesses created during the marriage. We hold that it was an abuse of discretion to rely on these two justifications for an unequal division and remand for the superior court's further consideration of the equitable division.

Finally, we affirm the superior court's valuation of the husband's 2010 income tax liability, because its finding is supported by the estimates given at trial and it was not required to revise the finding based on the husband's later submission of his actual return.

## II. FACTS AND PROCEEDINGS

### A. Facts

Andrew (Andy) and Becky Engstrom were married in 1998. Becky had been teaching in the public schools since 1997 and continued to do so during the marriage. In 1998 Andy started a window-cleaning business, Capital City Windows, and he worked primarily as a window washer. He started an online business in 2002 called Volitar Industries, which he used to sell his music, self-produced kits for window-cleaning businesses, and instructional videos. In 2003 the couple had a child. They separated in the fall of 2010.

**B.      Proceedings**

The superior court held a trial on issues of property division and child custody and then issued a written decision. The court awarded sole legal and primary physical custody of the couple's child to Becky; custody is not at issue in this appeal, which concerns only the identification, valuation, and division of the marital property.

One significant property issue involved Becky's health insurance benefits from the Teachers' Retirement System (TRS), in which she enrolled when she started teaching in 1997. It was during her marriage to Andy that Becky completed the eight-year vesting period, making her eligible for a health insurance subsidy upon her retirement. At trial, through the testimony of expert witnesses, the parties disputed how to identify the marital portion of these benefits. Andy contended that the benefits were marital to the extent they vested during the marriage,[1] whereas Becky contended that the marital portion should be based on her years of marriage as a fraction of her total years of employment.[2] The parties also disputed the value of the subsidy; Andy urged adoption of a composite rate that assumed Becky was likely to remarry, whereas Becky argued that her individual circumstances justified applying a lower, individual rate. The superior court adopted Becky's arguments on these two issues.

After identifying and valuing the marital property, the superior court divided it pursuant to AS 25.24.160(a)(4), allocating 58.4 percent to Becky and 41.6 percent to Andy. The court justified the unequal division on two grounds: first, that Andy was receiving income-producing properties in Volitar Industries and Capital City

---

[1]      Andy contended that this result was dictated by our decision in *Sparks v. Sparks*, 233 P.3d 1091, 1096-97 (Alaska 2010).

[2]      Becky's argument relied on our decision in *Hansen v. Hansen*, 119 P.3d 1005, 1015-16 (Alaska 2005).

Windows; and second, that Becky would likely have care and custody of their child for the foreseeable future, as well as the marital home.

Andy moved for reconsideration on several issues, submitting a revised expert report on the valuation of Becky's TRS benefits and evidence of his 2010 income tax liability showing that it was substantially greater than the estimates he had given at trial. The superior court declined to consider the new evidence and ultimately denied reconsideration. Andy filed this appeal, contending that the superior court erred in deciding (1) the marital portion of Becky's retirement health insurance benefits, (2) the rate used to determine the value of the TRS subsidy for those benefits, (3) the factors used to justify an unequal division of the marital property, and (4) his income tax liability.

## III. STANDARDS OF REVIEW

"There are three basic steps in the equitable division of marital assets: (1) deciding what specific property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably."[3] All three steps are relevant to this case. "In the first step, '[t]he characterization of property as separate or marital may involve both legal and factual questions' "; we review the superior court's legal conclusions de novo and its factual findings for clear error.[4] "Clear error exists when we are 'left with a definite and firm conviction that the superior court has made a mistake.' "[5] In the second step, the valuation of assets "is a factual determination that we

---

[3]     *Beals v. Beals*, 303 P.3d 453, 458 (Alaska 2013).

[4]     *Id.* at 458-59 (citations omitted) (quoting *Odom v. Odom*, 141 P.3d 324, 330 (Alaska 2006)).

[5]     *Ethelbah v. Walker*, 225 P.3d 1082, 1086 (Alaska 2009) (quoting *Josephine B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 174 P.3d 217, 220 (continued...)

review for clear error."[6]  "We review the trial court's third step, the equitable allocation of property, for an abuse of discretion."[7]  "An abuse of discretion occurs if the court considers improper factors, fails to consider relevant statutory factors, or assigns disproportionate weight to some factors while ignoring others."[8]

A superior court "has broad discretion to provide for the equitable division of property between the parties in a divorce," and we "will reverse only if the division [was] clearly unjust."[9]  We review the denial of a motion for reconsideration for abuse of discretion.[10]  Finally, "[w]e review questions of law de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[11]

## IV.   DISCUSSION

### A.   The Superior Court Did Not Err In Identifying And Valuing The Marital Portion Of Becky's Retirement Health Insurance Benefits.

Andy argues that the superior court made two errors with regard to Becky's retirement health insurance benefits:  it applied the wrong fraction for determining the

---

[5](...continued)
(Alaska 2007)).

[6]      *Beals*, 303 P.3d at 459.

[7]      *Id.*

[8]      *Hansen v. Hansen*, 119 P.3d 1005, 1009 (Alaska 2005).

[9]      *Ethelbah*, 225 P.3d at 1086.

[10]     *Neal & Co. v. Ass'n of Vill. Council Presidents Reg'l Hous. Auth.*, 895 P.2d 497, 506 (Alaska 1995).

[11]     *Ethelbah*, 225 P.3d at 1086.

portion of the benefits that were earned during the marriage, and it used the wrong rate for estimating the benefits' value. We conclude that the superior court did not err.[12]

### 1. The superior court used the correct coverture fraction to calculate the marital portion of Becky's retirement health insurance benefits.

In *Hansen v. Hansen*, we addressed how courts should determine whether one spouse's retirement health insurance benefits are marital or nonmarital property and, if both, how to determine the marital portion.[13] We explained that unlike pre-retirement health insurance benefits, which "are compensation for contemporaneously performed work," post-retirement benefits are earned throughout the employee's work-life and may well be the product of work performed before, during, and after a marriage.[14] To the extent the benefits are earned during marriage, they are marital property.[15] Determining

---

[12] Andy's argument rests in part on evidence he submitted on reconsideration, including an "Engstrom Post-Decision Expert Report" with attachments explaining the TRS health benefit system, his expert's revised version of a marital probability table originally prepared by Becky's expert, and a study of marriage trends from the Centers for Disease Control and Prevention. The superior court did not abuse its discretion when it declined to consider this evidence. *See Neal & Co.*, 895 P.2d at 506 ("We refuse to allow a motion for reconsideration to be used as a means to seek an extension of time for the presentation of additional evidence on the merits of the claim."). In any event, both parties discuss the evidence on appeal, and we conclude that it would not change the result.

[13] 119 P.3d at 1014-16.

[14] *Id.* at 1015. In *Hansen*, work performed before the marriage was treated as having been performed during the marriage because the couple used marital funds to buy back benefits that had been cashed out before they were married.

[15] *Id.* ("Health insurance benefits earned during the marriage are a marital asset of the insured spouse.").

the benefits' marital portion requires calculation of the "coverture fraction."[16] "This fraction is calculated by dividing the number of years worked during the period of coverture by the total number of years worked."[17] Our focus in *Hansen* was on the coverture fraction's numerator — the number of years worked during the marriage. As for the fraction's denominator — "the total number of years worked" — in *Hansen* we noted the difficulty of determining this number when it remains uncertain how long the earning spouse will continue to work after divorce.[18]

It is the denominator that is at issue in this case. Andy argues it should be the eight years during which Becky's benefits vested, and that the coverture fraction is thus as high as 95 percent.[19] Becky argues that the proper denominator is the same as that used in *Hansen*: "the total number of years worked,"[20] a number that includes her employment to date and projected into the future.[21]

To decide this contested issue, the superior court compared our decision in *Hansen* with our later decision in *Sparks v. Sparks*, in which we affirmed a finding that

---

[16]    *Id.*

[17]    *Id.* (citing BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 6.10 (2d ed. 1994)).

[18]    *Id.* at 1015-16.

[19]    Andy's expert testified at trial that the coverture fraction was 85 percent if limited to the period Andy and Becky were married and 95 percent if it included their pre-marriage period of cohabitation.

[20]    119 P.3d at 1015.

[21]    *See id.* at 1016.

retirement benefits were not marital.[22]  In *Sparks*, the wife's lifetime health insurance benefits with the Public Employee Retirement System had fully vested before marriage.[23] At trial she presented expert testimony that the monthly premium contributions she continued to make during marriage went entirely to that month's coverage, and that nothing she did during marriage added value to the amount of the subsidy the State would eventually pay for her continued health insurance benefits after retirement.[24]  We affirmed the superior court's conclusion in *Sparks* that the retirement benefits were separate property because its "factual finding that all of the value of [the wife's] post-retirement health benefits were earned before marriage is supported by the record and not clearly erroneous."[25]

In this case, the parties' experts did not dispute the facts but rather how the facts should be interpreted given *Hansen* and *Sparks*.  Both experts agreed that Becky's employer contributes an amount equal to 16 percent of an employee's salary to the TRS retirement health benefit plan for every pay period regardless of whether the employee has vested.  They agreed that the employer becomes responsible for the future retiree's health benefit subsidy once vesting occurs and that the value of that future benefit is known at the time of vesting. The employer's contribution to retirement health insurance benefits, calculated as a portion of the employee's compensation, is thus continuous throughout the employee's employment regardless of when she vests; and vested employees thus continue to share in the cost of retirement health insurance benefits to the same extent as non-vested employees.  The superior court concluded that "to the

---

[22]     233 P.3d 1091, 1096-97 (Alaska 2010).

[23]     *Id.* at 1093.

[24]     *Id.* at 1097.

[25]     *Id.*

extent that the post-retirement health benefit is a part of the compensation paid to *all* employees, I do not find that it would be fair to allocate that benefit only prior to the date of vesting."[26] The superior court therefore applied the coverture fraction from *Hansen*, as Becky's expert testified was appropriate, without regard to when vesting occurred.

Andy argues that the case should be governed instead by *Sparks*, which he contends stands for the proposition that "[r]etiree health benefits under [TRS] are valued based on the first 8 years of service, the vesting period," regardless of when the benefit is funded. In other words, an eight-year vesting period that falls entirely within a ten-year marriage would mean that the value of retirement benefits is entirely marital, even if the earning spouse works for another 20 years after divorce and the employer continues to contribute to the fund from which the benefits will be paid.

We conclude, however, that the earning spouse continues to pay for even fully-vested retirement benefits while she continues to work, both through her employer's contributions and through her acceptance of a lower salary than she might otherwise receive. As explained by Brett Turner, a recognized authority on the equitable division of marital property, "[e]mployers simply do not make gratuitous transfers to their employees without expecting anything in return."[27] We agree with Turner's further observations that "[i]f the employer did not make contributions to his employee's pension plan, it would have to pay its employees a higher salary in order to retain them," and "[t]he employer's direct contributions are therefore just as much a product of the

---

[26]    (Emphasis in original).

[27]    2 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 6:22, at 141 (3d ed. 2005).

marital partnership as the employee's direct contributions. . . ."[28]  In other words, even though an employee could stop teaching after eight years and be entitled to full medical benefits upon retirement, the employee continues to pay for those benefits as long as she continues to work.  We overrule *Sparks* to the extent it is inconsistent with this conclusion.

> **2.  The superior court correctly applied the individual rate rather than the composite rate to calculate the value of Becky's retirement medical benefits.**

The second benefits-related issue on appeal is whether the superior court used the correct rate for calculating the value of Becky's retirement medical benefits.  There are several options, including the individual rate and the composite rate.[29]  The individual rate, which Becky advances, is the amount the employee would pay if she were required to pay her own premiums to insure only herself.[30]  The composite rate, advanced by Andy, is the average premium cost of all employees; as such it takes into account the differences in the entire pool, including the fact that some employee-participants have covered spouses and dependents or are likely to acquire them in the future.[31]  The composite rate is accordingly about 50 percent higher than the individual rate.[32]  The superior court chose the individual rate, finding that it best reflected the

---

[28]     *Id.*; *Laing v. Laing*, 741 P.2d 649, 656 n.19 (Alaska 1987) (observing that employer contributions, "to the extent they were made during marriage, ought to be considered a marital asset").

[29]     *See Ethelbah v. Walker*, 225 P.3d 1082, 1089 (Alaska 2009).

[30]     *Id.*

[31]     *Id.* at 1089-90.

[32]     *Id.* at 1089.

reality of Becky's situation — primarily the relatively low likelihood that she would remarry.

We addressed this issue in *Ethelbah v. Walker*, in which we affirmed the superior court's use of the individual rate for valuing the wife's post-retirement health benefits.[33] We were persuaded that the composite rate would likely overstate the value of the wife's coverage because "[t]he assumptions inherent in the composite rate, for dealing with unknown future familial status, [were] not applicable to [her]. It was known that [she] was sixty-four years old and had breast cancer, making her less likely than the average insured to remarry or acquire additional dependent children."[34] Use of the individual rate in *Ethelbah* was thus clearly based on the superior court's factual findings about the covered spouse's circumstances. We concluded that the superior court "did not err as a matter of law or make any erroneous factual findings in adopting the individual rate calculation to value this asset."[35]

Andy argues that *Ethelbah* is distinguishable because Becky is younger, healthier, and therefore more likely to remarry than the wife in that case, making the composite rate more appropriate.[36] Andy's expert testified that it would be appropriate to use the composite rate for a woman with "a greater than 50 percent probability of remarriage" and that Becky was in that category. Becky's expert did not dispute the 50 percent figure but focused his testimony on the probability that Becky would be

---

[33]    *Id.* at 1090.

[34]    *Id.*

[35]    *Id.* ("As the trial court concluded, the individual rate 'most closely approximates the likely premium rate charged by the State for estimated costs of claims, given [the former wife's] life expectancy and personal circumstances.' ").

[36]    At the time of trial Becky was 47 years old and in good health; her minor child was unlikely to still be a dependent when Becky reached retirement age.

remarried in any given year after retirement. He presented a 1995 study from the National Center for Health Statistics accounting for rates of marriage and divorce, which he adapted into a table. According to the table, there was no future year in which Becky was more likely than not to be remarried; the highest likelihood of remarriage in any given year was 28.8 percent.

Andy relies on his own expert's testimony that Becky had a greater than 50 percent chance of remarrying; but as the superior court pointed out in its order, Andy's expert "could cite no studies and no specific figures" in support of her estimate. The superior court found the estimate of Becky's expert, on the other hand, to be "specific and credible." Andy contends that Becky's expert improperly expanded on his conclusions on the last day of trial, giving Andy's expert no chance to respond. Andy presented an amended expert report in his motion for reconsideration, attaching a government study which, according to Andy, shows that 58 percent of white women remarry within five years of divorce. Even if the superior court had been required to consider the late-submitted evidence, however, it would not have undercut its conclusion. The study is based on women ages 15 to 44, a range that does not include Becky. There is no clear error in the superior court's acceptance of the estimate of Becky's expert regarding her likelihood of remarriage. And the court did not err in its legal conclusion — that "[t]he individual rate, therefore, would seem to come closer to Becky's likely situation."

**B.      Reliance On Andy's Receipt Of Income-Producing Businesses And The Costs Of Child Care To Justify An Unequal Property Division Was An Abuse Of Discretion.**

"Although an equal division of property is presumed to be the most equitable, the trial court has broad discretion to deviate from absolute equality."[37] "An abuse of discretion occurs if the court considers improper factors, fails to consider relevant statutory factors, or assigns disproportionate weight to some factors while ignoring others."[38] Here, the superior court awarded 58.4 percent of the marital property to Becky and 41.6 percent to Andy.  It found that Becky's education, job skills, and employment "may cut slightly" toward a division that favored Andy, whose work history was less consistent; that most other relevant factors were "essentially a 'wash' "; but that two factors favored an unequal distribution in Becky's favor.  The first of these was "that the property allocated to Andrew will be income-producing property (Volitar and Capital City Windows)."  The second was that Becky "is likely to have care and custody of [the couple's child] for 'some time to come,' . . . will be receiving the marital home in this order, and will need to maintain a home for [the child]."  Andy argues that the court gave disproportionate weight to these two factors, and that the unequal division that resulted did not fairly allocate the economic effects of the divorce as required by AS 25.24.160(a)(4).  We agree that this issue requires remand.

---

[37]      *Veselsky v. Veselsky*, 113 P.3d 629, 637 (Alaska 2005) (quoting *Ulsher v. Ulsher*, 867 P.2d 819, 822 (Alaska 1994)).

[38]      *Hansen v. Hansen*, 119 P.3d 1005, 1009 (Alaska 2005).

**1.      It was an abuse of discretion to use the income-producing capacity of Volitar Industries and Capital City Windows to justify an unequal division of marital property where the parties' situations were not otherwise equal.**

The superior court correctly observed that AS 25.24.160(a)(4)(I) requires it to consider, among other factors, "the income-producing capacity of the property and the value of the property at the time of division." The superior court adopted the "Rule of Thumb" method proposed by Becky's expert to value the two marital businesses. This method considered the businesses' income-producing capacity by averaging five years of annual sales, then applied formulas from an industry-specific reference guide that presume a small business can be sold at a certain percentage of its average annual sales. Andy does not challenge the resulting valuations. But the superior court, having valued the two businesses and allocated their value to Andy, considered their income-producing capacity again when deciding that there should be an unequal division of property in Becky's favor.[39] Andy argues that "[t]he court double charged [him] for these marital assets by placing the value of the businesses under his column as an asset in the property chart and using the same information to support an unequal division of property."

The superior court's consideration of the businesses' income-producing capacity in the valuation stage does not preclude later consideration of the same factor when the court is deciding how the property should be equitably divided. As noted above, AS 25.24.160(a)(4)(I) expressly requires it. In *Brooks v. Brooks* we concluded that a remand was necessary in part because the superior court had awarded rental

---

[39]      "Property division consists of three steps:  (1) assessing the nature of the property (marital or nonmarital); (2) valuing the property; and (3) equitably allocating the property." *Brandal v. Shangin*, 36 P.3d 1188, 1191 (Alaska 2001).

property to one spouse without explicitly considering that it would likely generate significant income for her.[40]

However, we find merit in Andy's argument that the superior court gave the businesses' income-producing capacity disproportionate weight when it used that factor as one of two that justified an unequal division in Becky's favor. On this issue, too, we agree with a relevant observation from Turner's treatise: "*If all other factors are equal*, a spouse who receives property with a greater income capacity should receive a smaller share of the total estate."[41] Here, although Andy received the income-producing marital property, all other factors were not equal. As a teacher, Becky earned approximately $61,000 a year plus benefits; but setting aside the businesses, Andy had no regular income. Awarding Andy the income-producing property was necessary in order to roughly equalize the financial effects of the divorce.[42] We conclude that the "income-producing capacity" of property under AS 25.24.160(a)(4)(I) generally supports an unequal distribution only when the property will provide a substantial economic advantage to the party who receives it — not when, as here, the property only levels the parties' burdens.[43] It was an abuse of discretion to reduce Andy's share of the marital estate on grounds that he was allocated income-producing property that simply allows him to achieve an income on par with Becky's.

---

[40]    677 P.2d 1230, 1233-34 (Alaska 1984).

[41]    TURNER, *supra* note 27, § 8:32, at 937 (emphasis added).

[42]    The two businesses together earned approximately $75,000 in 2010.

[43]    AS 25.24.160(a)(4) ("[T]he division of property must fairly allocate the economic effect of divorce . . . .").

**2.** **It was an abuse of discretion to consider child-raising costs in the property division without first finding that child support was inadequate to meet the child's needs.**

For the other of the two reasons for unequal division of marital property in Becky's favor, the superior court observed that Becky was "likely to have primary physical custody [of the parties' child] for the foreseeable future" and that she "will be receiving the marital home . . . and will need to maintain [it] for [the child]." We conclude that reliance on this justification was also an abuse of discretion.

We addressed this issue most recently in *Rodvik v. Rodvik*, in which the former husband had a history of domestic violence, some of it directed against the children.[44] The superior court determined that "the property division, while weighted slightly in [the wife's] favor, is equitable given the fact that [the wife] will be caring for the parties' children in the future and the children will likely need counseling for years to come."[45] We held this was error. We cited Turner's treatise for the proposition that "the needs of the children should generally not be a factor in determining the amount of marital property assigned to each spouse."[46] We noted Turner's supporting citation of our own decision in *Brandal v. Shangin*,[47] in which we held that "[f]or a trial court to award one spouse a greater share of the marital property simply to ease his or her burden of child support constitutes reversible error."[48] And we favorably quoted Turner's

---

[44]    151 P.3d 338, 341 (Alaska 2006).

[45]    *Id.* at 347.

[46]    *Id.* (quoting TURNER, *supra* note 27, § 8.22).

[47]    36 P.3d 1188 (Alaska 2001).

[48]    *Rodvik*, 151 P.3d at 347 (quoting *Brandal*, 36 P.3d at 1194) (internal quotation marks omitted).

suggestion that "property division should be used to meet the needs of the children only in the presence of a specific reason why this goal cannot be met with an award of child support alone."[49] Applying these principles in *Rodvik*, we concluded that before the superior court could make an unequal division of the marital property to help account for the children's counseling needs, "it must first determine whether the child support is adequate to meet [those] needs," and we remanded the case for additional findings on the subject.[50]

In this case, the superior court did not make findings about whether child support was inadequate to meet the child's needs. In the absence of such findings, an unequal property division that rested in part on Becky's child-care responsibilities was error. We remand for the superior court to reconsider the equitable division of the marital property.

### C. The Superior Court Did Not Clearly Err In Valuing Andy's 2010 Tax Liability.

Andy argues that the superior court erred in its valuation of his 2010 tax liability when it relied on his trial estimates instead of his actual return, which he did not prepare until after trial and did not present to the court until he filed his motion for reconsideration.[51] The superior court reasoned that "it was [Andy's] choice to delay filing his taxes. Even if he wished to delay filing his taxes, he could have calculated his liability without actually filing a return, and presented that evidence at trial. The information needed to calculate his tax liability was entirely within his control."

---

[49]    *Id.* (quoting TURNER, *supra* note 27, § 8.22).

[50]    *Id*.

[51]    Trial was in August 2011; the court issued its written decision on March 9, 2012; and Andy filed his motion for reconsideration ten days later on March 19, seven months after trial.

The superior court did not abuse its discretion in declining to consider Andy's late-filed evidence.[52]  And based on the evidence presented at trial, the superior court's estimate of Andy's 2010 tax liability was not clearly erroneous.

## V.    CONCLUSION

We REVERSE the superior court's equitable division of the marital property and remand for further proceedings consistent with this opinion.  In all other respects we AFFIRM the decision of the superior court.

---

[52]    *Neal & Co. v. Ass'n of Vill. Council Presidents Reg'l Hous. Auth.*, 895 P.2d 497, 506 (Alaska 1995) ("We refuse to allow a motion for reconsideration to be used as a means to seek an extension of time for the presentation of additional evidence on the merits of the claim.").

WINFREE, Justice, dissenting in part.

I respectfully disagree with the court's new framework for identifying the marital portion of a retirement benefit that is completely earned in a finite period of service time and that has a value not dependant on (1) any future financial contributions from the employee, or (2) the employee's continued employment. I would follow, not reverse, our very recent decision in *Sparks v. Sparks*.[1]

The retirement benefit in this case was a contractual right Becky Engstrom earned by working for a required number of years. The court's quotation from Brett Turner that employers don't make gratuitous transfers to employees without expecting anything in return must be read in context and does not support the court's position. The quotation is taken from a section where Turner explains that retirement benefits are property rights based in contract.[2] Distinguishing retirement benefits from professional degrees and inheritances and articulating why retirement benefits are property, Turner emphasizes that: (1) "[r]etirement benefits are *contractual* rights"; (2) once benefits have been earned the employee "has a legally enforceable right to receive" them in the future;

---

[1]     233 P.3d 1091, 1097 (Alaska 2010) (concluding that post-retirement health benefits were separate property when the entire *value* of the benefits was "earned before marriage").

[2]     2 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 6.22 at 131-32, (3d ed. 2005) ("There are two substantial questions which arise when courts use their equitable distribution statute to classify retirement benefits. First, the court must determine whether the benefits meet the definition of *property*; and second, the court must determine which benefits were *acquired during the marriage*. This section considers the first of these questions." (Emphasis in original.)).

and (3) employers "frequently use lucrative retirement packages in lieu of additional salary to attract and retain desirable employees."[3]

Turner then explains why it does not matter whether a retirement benefit arises from employee contributions, employer contributions, or both, stating that the notion that employee contributions are necessary to create property does not make sense because the employer contributions were made as part of the employment contract.[4] Within this context Turner states: "Employers simply do not make gratuitous transfers to their employees without expecting anything in return."[5] But in this section Turner is notably silent on when an employee's retirement benefits are acquired or funded,[6] leaving that issue to other sections.[7]

Here the contract was simple: work a certain number of years and earn a defined retirement health benefit. Becky worked those years and acquired the future benefit; she did not get something for nothing. No matter how the benefit ultimately is funded, Becky fully performed her part of the bargain, and her employer received the full bargained-for consideration. Becky had no obligation to work more years to receive the benefit, and she had no obligation to pay anything for the benefit during or after the vesting period. The fact that the benefit is funded with a legal Ponzi-like scheme, using current health care premiums to fund both current employees' and retired employees' health benefits and leaving any day of reckoning to the Alaska Legislature, cannot

---

[3]    *Id.* at 132-33.

[4]    *Id.* at 140-41.

[5]    *Id.* at 141.

[6]    *See id.* at 131-42.

[7]    *See id.* §§ 6:24-25, at 142-49.

change the fact that Becky earned the retirement benefit the day she completed the required service period.[8] No part of the retirement benefit was earned or acquired after the day Becky reached her service requirement.[9] In my view the number of years of marriage during the required service period must be the numerator and the number of years of the service requirement must be the denominator in the coverture fraction.[10]

---

[8] In *Hanson v. Hanson* we noted: "[P]ost-divorce, pre-retirement health insurance benefits are compensation for contemporaneously performed work and are therefore separate property, whereas post-retirement health insurance benefits are compensation for work previously performed." 119 P.3d 1005, 1015 (Alaska 2005) (citing TURNER § 6.26 (2d ed. Supp. 2004)). It appears to me that along with expressly overruling *Sparks v. Sparks*, 233 P.3d 1091 (Alaska 2010), the court implicitly overrules this portion of *Hanson* as well.

[9] *Cf. Young v. Kelly*, 334 P.3d 158-59 (Alaska 2014) (stating that "we deem [retirement benefits] acquired during marriage to the extent the working spouse earns them during the marriage"); *Sparks*, 233 P.3d at 1097 (stating retirement benefits "are usually designated as partly marital and partly separate based on which portion was earned during the marriage"). Again, no portion of the retirement benefit was earned after Becky fully vested.

[10] *See* TURNER, *supra* note 2, § 6.25, at 149-50 (stating coverture formula as "creditable time during the marriage" divided by "total creditable time" and noting the denominator "must match *exactly* the period of time over which the employee acquired the benefit" (emphasis in original)). Here Becky acquired the benefit at vesting, and the only relevant creditable time was the vesting period.

It is true that in *Hanson* the court stated that the coverture fraction denominator should be the total number of years worked. 119 P.3d at 1015. But the focus of the decision was on the numerator, and no facts about the denominator factors were before the court, or at least were not discussed in the opinion. If post-retirement health insurance benefits were continuing to be earned post-divorce throughout the work life, *Hanson*'s statement about the denominator was entirely correct; but, again, that was not the focus of that decision.