NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ERICK JUMA, | ) | |
| | ) | Supreme Court No. S-18942 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-22-02537 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| REKETTA PETERSON, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 2083 – March 26, 2025 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Patricia L. Haines, Judge.

Appearances: Erick Juma, pro se, Fairbanks, Appellant. No appearance by Appellee Reketta Peterson.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I. INTRODUCTION

A couple separated after eight years of marriage. Following a trial the superior court awarded the woman primary physical custody of the couple's three children and divided the marital property 50/50. The man appeals, arguing the superior court erred when it maintained a stipulated no-contact order, when it determined certain

---

\*      Entered under Alaska Appellate Rule 214.

debts were not marital, and when it valued a building the couple owned. We affirm the superior court's decision.

## II.    FACTS AND PROCEEDINGS

In 2014 Erick Juma and Reketta Peterson married in South Korea. They have three minor children. Juma joined the Army in 2017 and was stationed in Alaska. The parties bought an apartment building in 2020; they were living there when they separated.[1] In September 2022, while Juma was on a trip to Kenya, Peterson moved to Georgia with the children.

Peterson filed for divorce in December 2022 and requested sole physical custody of the children. She also filed a petition for a domestic violence protective order (DVPO), but subsequently agreed to a mutual no-contact order instead.

Trial was held in September and October 2023; each party was represented by an attorney. Five witnesses testified: Peterson, a friend of hers, Juma, and two of his friends.

Peterson's friend testified that she met Peterson virtually through their work in Alaska, but had never met her or Juma in person. She testified that in September 2022 Juma began messaging her, and threatened to "send all of our communication to your ex-husband" if she did not end her friendship with Peterson. The friend showed the court screenshots of messages she had received from Juma, directing her to block Peterson from her phone: "Let me know once blocking has been done. End that friendship. OTHERWISE YOUR HUSBAND GONNA GET IT ALL . . . and am coming for you as well!! 4 more HRS!! AM WAITING TO HERE FROM THAT, THAT FRIENDSHIP IS NO MORE!!" She also testified that she did not believe Juma had actually contacted her ex-husband.

---

[1]     The building's purchase date was disputed, but the deed listed a date of 2020.

Peterson testified that when she had told Juma she wanted to leave the marriage, Juma told her that he knew "certain information" about Peterson and her friends that he had obtained by using his military security clearance. She testified that Juma told her to "cease all communication" with her friends or he would "make it hell" for them. She stated that Juma told her he knew where one of her friends lived and sent someone by that friend's house. Peterson also testified that Juma told her he had access to her emails and messages. Peterson stated that she was concerned for her friend's safety, so she reported the incident to military police. She testified that she also told the military police that Juma had sexually assaulted her.[2] Peterson stated that the military police then issued a Military Protective Order (MPO), which required Juma to participate in counseling.

Peterson testified that she also filed a petition for a DVPO in state court. She testified further that she and Juma had agreed to have the court issue a no-contact order instead of the DVPO to avoid hurting his military career and benefits. The no-contact order prohibited Juma from communicating with Peterson except through the "Our Family Wizard" application to discuss matters regarding their children.

Peterson testified that Juma had violated the no-contact order by sending her text messages and calling her about the divorce, their relationship, and the children through WhatsApp and provided a screenshot of one of the messages. She stated that she wanted the no-contact order to remain in effect after their divorce.

Peterson testified that she and the children left Fairbanks and moved to Georgia where she had family and had attended college. She testified that she was working virtually as a counselor and that she moved to Georgia because she "was not feeling safe with my husband."

---

[2] Peterson alleged that Juma had forced himself on her and attempted to have sex with her on several occasions. She also testified that shortly before she left Fairbanks he had "started to escalate" and was "pushing onto [her] more and more."

Peterson testified that she did not know anything about debts Juma claimed were marital. Juma had listed a debt to one friend of $11,000, and debts of $15,000, $4,500, and $900 to other friends; Peterson did not list values for any of them. Peterson testified that she had not seen any evidence to support the existence of the debts. She said that Juma did not tell her about the debts and that he had not included them in his initial disclosures.

Peterson also testified about the value of their real property. She testified that although the tax-assessed value of their apartment building was $387,989 in 2023 and her previous estimate for its value was $425,000, she believed that it was worth between $410,000 – $415,000 due to renovations.

Juma presented two witnesses. One testified that in 2021 she had observed Juma with his children and that he was a loving father. The other friend, Augustine Amonge, testified that he lent Juma $8,000 for a down payment on the apartment building. He stated that Juma had repaid a "ballpark number" of $1,500, but he did not have any record of the amount Juma actually paid, and that there was no set timeframe for him to repay the remainder.

Juma testified last. He said that he did not know Peterson was going to move with the children. He denied Peterson's claims that he had sexually assaulted her. He also denied using or threatening to use his security clearance inappropriately, explaining that his clearance only allowed him to "access special information" about the helicopters he worked on. He testified that he was able to gain access to Peterson's messages because her phone was synced with their daughter's phone.

Juma admitted sending Peterson's friend messages threatening to reveal information about her to her husband, but stated that he did not intend to threaten or harm her. He acknowledged sending messages to Peterson. He stated that they had

mutually agreed that the no-contact order was not working for them and that the MPO permitted communication through WhatsApp.[3]

Juma acknowledged that he had sent Peterson a message that she and the children would lose military health benefits if she continued with the military case against him alleging sexual assault. He said he told her that losing insurance would be a consequence of either his separation from the military later in 2023 or the outcome of the military disciplinary proceedings.[4] And he testified that he had completed the requirements of the MPO.

Juma also testified about the value of their real property. Juma testified that he and Peterson paid $345,000 for the building. He believed that an appropriate value for the property was between $340,000 and $388,000,[5] rather than Peterson's estimate of $410,000 – $415,000.

Juma testified that he had "checks" and "CashApp" transactions to show the existence of the debts he claimed were marital, but he did not provide any documentation. He stated that the loan from Amonge for $11,000 was to help pay for the house when the couple purchased it. He said that the $15,000 debt was used to repair a boiler in the apartment building and that the $4,500 debt was to help finish the garage.[6]

---

[3]    Peterson denied on cross-examination that she had agreed to modify the no-contact order or the MPO.

[4]    At the time of trial, Juma was on terminal leave from the Army because he was considered 100% disabled, and he completely separated from the military in December 2023.

[5]    Juma submitted a 2020 pre-purchase appraisal report indicating a $340,000 value to support his estimate. Juma also stated that any later appraisals or property tax valuations would have shown an increased value relative to what he thought was a correct value because of renovations to the building.

[6]    The court ruled the $900 owed to another friend was not established due to lack of evidence because the friend was not called as a witness.

The superior court issued its decree of divorce and findings of fact and conclusions of law. It extended the no-contact order. It concluded that none of the debts Juma owed to friends were marital; it valued the apartment building at $415,000; and it found that a 50/50 property distribution was equitable, noting that neither party had requested anything other than a 50/50 distribution.

Juma appeals the no-contact order and the court's property valuation and distribution.

## III. STANDARD OF REVIEW

We review decisions to impose a no-contact order for an abuse of discretion.[7]

"Division of marital property involves three steps: '(1) deciding what specific property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably.' "[8] "[C]haracterization of property as separate or marital may involve both legal and factual questions."[9] We review the factual findings underlying the division of marital property for clear error, and we review legal conclusions de novo.[10] "[V]aluation of assets 'is a factual determination that we review for clear error.' "[11]

---

[7] *Wee v. Eggener*, 225 P.3d 1120, 1126 n.21 (Alaska 2010).

[8] *Thompson v. Thompson*, 454 P.3d 981, 988 (Alaska 2019) (quoting *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015)).

[9] *Id.* (alteration in original) (quoting *Engstrom*, 350 P.3d at 769).

[10] *Id.* at 988-89 (first citing *Hall v. Hall*, 426 P.3d 1006, 1009 (Alaska 2018); then citing *Engstrom*, 350 P.3d at 769).

[11] *Id.* at 989 (alteration in original) (quoting *Engstrom*, 350 P.3d at 769).

## IV. DISCUSSION

### A. No-Contact Order

Juma argues the court erred by imposing the stipulated no-contact order. He argues that these orders should only apply where there is "danger or a serious domestic violence."[12] But the court found by a preponderance of the evidence that Juma had committed coercion against both Peterson and her friend.[13] The court reasoned that the no-contact order should continue because of the coercion and the history between Juma and Peterson.

We have upheld stipulated no-contact orders against the party that had committed domestic violence against the other.[14] The superior court found that Juma had committed the domestic violence crime of coercion against Peterson.[15] The superior court did not abuse its discretion when it imposed and maintained the no-contact order.

---

[12] Juma also argues the court relied on hearsay evidence when it considered Peterson's testimony about his communications to her. But Juma is a party opponent to Peterson, and an admission by a party opponent is not hearsay. *See* Alaska R. Evid. 801(d)(2).

[13] *See* AS 11.41.530(a)(3) ("A person commits the crime of coercion if . . . the person compels another to engage in conduct from which there is a legal right to abstain or abstain from conduct in which there is a legal right to engage, by means of instilling in the person who is compelled a fear that, if the demand is not complied with, the person who makes the demand or another may . . . expose confidential information or a secret, whether true or false, tending to subject a person to hatred, contempt, or ridicule . . . .").

[14] *See Wee v. Eggener*, 225 P.3d 1120, 1127-28 (Alaska 2010); *Polen v. Miller*, No. S-18218, 2023 WL 1812732, at *6 (Alaska Feb. 8, 2023) (upholding mutual no-contact order based on allegations of domestic violence against each party).

[15] *See* AS 18.66.990(3)(A); AS 11.41.530(a)(3).

## B.    Debts

Juma argues that the court erred by concluding that the debts were not marital without hearing testimony from his friends who were "critical witnesses." But it was Juma's obligation to call witnesses to testify on his behalf.[16] In *Hartland v. Hartland* we said that "a party who fails to present sufficient evidence at trial should not be allowed on appeal to challenge the inadequacy of evidence."[17] In *Stanhope v. Stanhope* we agreed with the superior court's finding that there was insufficient evidence to prove a debt's existence.[18] Because the party arguing that a debt was marital failed to provide enough evidence, we concluded that the superior court did not err in finding that the debt could not be proven as marital.[19] Here, Juma called one friend, Amonge; another friend was unable to participate because his videoconference link was not working; and a third did not answer the court's phone calls. And Juma did not call his final proposed witness.

Amonge testified he loaned Juma only $8,000[20] for the $11,000 down payment Juma claimed he had borrowed.[21] Juma relied on only his own uncorroborated testimony in support of the three debts. And Peterson testified that she did not know anything about the debts. In light of the conflicting testimony and lack of corroboration

---

[16]    *See Hartland v. Hartland*, 777 P.2d 636, 640-41 (Alaska 1989).

[17]    *Hartland*, 777 P.2d at 640.

[18]    *Stanhope v. Stanhope*, 306 P.3d 1282, 1290-91 (Alaska 2013).

[19]    *Id.*

[20]    On appeal Juma adjusts his claim to only $8,000, matching Amonge's testimony.

[21]    Although the superior court mistakenly stated that Amonge had testified that the loan was to fix Juma's boiler, the court still found Amonge's testimony to be conflicting about the amount Juma owed and there was no documentary evidence of the debt. Although it was a mistake to assign the testimony to Amonge, it was harmless.

of the existence or amount of Juma's claimed debts, the court did not clearly err by declining to include them in the marital estate.[22]

The superior court "judge[s] witness credibility and . . . weigh[s] conflicting evidence."[23] It observed that the many undocumented exchanges of money between Juma and Amonge "call[ed] into question the current state of finances between them." And it reasonably concluded that the evidence did not support Juma's claim that the debt to Amonge was marital. We defer to the trial court especially when its fact findings depend "primarily on oral testimony, because the trial court, not this court . . . weighs conflicting evidence."[24] Furthermore, Civil Rule 26.1(b) requires a party in a divorce to provide written documentation or statements from creditors listing the owed balances and the terms of repayment for any debts.[25] Juma did not provide any such documentation. The evidence presented in support of this debt's existence consisted solely of Juma's and Amonge's testimony; no documentation of it was entered into evidence. Because Juma did not provide sufficient evidence of the existence or amounts of the debts he claimed were marital, they cannot be included in the marital estate.

The superior court reasonably decided that the evidence at trial was insufficient to establish the existence or amount of the debts. It did not clearly err when it determined that the four debts were not marital.

---

**22** *See Stanhope*, 306 P.3d at 1290-91 (affirming finding of insufficient evidence when appellant "failed to introduce [better] evidence at trial.").

**23** *Luker v. Sykes*, 357 P.3d 1191, 1199 (Alaska 2015) (quoting *Fyffe v. Wright*, 93 P.3d 444, 450 (Alaska 2004)).

**24** *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014) (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011)).

**25** Alaska R. Civ. P. 26.1(b)(1)(F).

## C. The Apartment Building's Value

Juma argues that the court erred when it determined the value of the apartment building and points out that the building now has five units, not four. He asserts that the court should have looked at the value of comparable buildings rather than its assessed value to determine an appropriate value. [26]

Juma testified that he had added an apartment to the building, and the borough tax assessment indicated that the building has five units. But the court did not rely on the number of apartments in the building when it determined its value. Although it was a mistake to describe a five unit building as a fourplex, that error was harmless.

The court valued the building at $415,000 after weighing the conflicting evidence presented. It compared the assessed value at the time the couple purchased the apartment building, $312,000, to the price they actually paid for it, $345,000. The court then considered the 2023 assessed value, $387,000. The court looked at the increase in the building's value over time, Juma's testimony that he had improved the property, and the roughly $30,000 difference between assessed and appraised value in 2020. It then valued the building at $415,000 — approximately $30,000 more than assessed value, similar to the $30,000 difference in 2020. The court did not clearly err.

## V. CONCLUSION

The superior court's decision is AFFIRMED.

---

[26] Juma also argues that the court should have factored in a number of expenses when it determined the building's value. But those considerations only become relevant when the court has ordered the home to be sold, and the court did not do so here. *See Beal v. Beal*, 88 P.3d 104, 117 (Alaska 2004) (citing *Tollefsen v. Tollefsen*, 981 P.2d 568, 571-72 (Alaska 1999)).